IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2002

## STATE OF TENNESSEE v. JOSHUA ALAN STEAKLEY

**Direct Appeal from the Circuit Court for Hardin County**
**No. 8028     C. Creed McGinley, Judge**

---

**No. W2001-02996-CCA-R3-CD  - Filed April 25, 2003**

---

The defendant was convicted of burglary, a Class D felony, after a jury trial and was sentenced to two years, six months, with all but fifteen days suspended, and the balance to be served on supervised probation.  The defendant was also ordered to pay $353.95 in restitution to North Elementary School.  On appeal, he argues that the evidence was insufficient to support his conviction and that the trial court erred in denying full probation and ordering that he serve fifteen days in confinement.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Chadwick G. Hunt, Savannah, Tennessee, for the appellant, Joshua Alan Steakley.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; G. Robert Radford, District Attorney General; and John W. Overton, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant, Joshua Alan Steakley, and two codefendants, Timothy Lard and Stephen Copeland, burglarized the North Elementary School in Savannah, Tennessee, during the late evening hours of September 23, 2000, taking two cases of toilet paper from a janitorial room and a stop light hanging on a wall in the cafeteria.  Prior to the defendant's August 8, 2001, trial, Lard and Copeland, a juvenile, pled guilty to burglary.  At the defendant's trial, Lard testified that his sentencing hearing was set for September 11, 2001, and Copeland testified that he was placed on probation and ordered to pay fines.

Bobby Neill, a custodian at North Elementary School, testified that when he arrived at the school on the morning of Sunday, September 24, 2000, he went upstairs to check the boiler system and found footprints coming into the school from a window in the hallway. He immediately went downstairs and called the police and the school principal. When the police arrived, Neill and the officers began checking the building and discovered that two cases of toilet paper[1] and a stop light[2] were missing. When Neill went up to the roof of the school three or four days later to check the drains, he found a ten-foot aluminum ladder that should not have been there and subsequently turned it over to the police.

Seventeen-year-old Stephen Copeland testified that on the evening of the burglary, he picked up Timothy Lard in his red Nissan pickup truck and then drove to the defendant's house, arriving "somewhere around eight thirty or nine o'clock" p.m. About thirty minutes later, he, the defendant, and Lard "took off walking down the road," leaving his truck at the defendant's house. The trio wound up at North Elementary School and decided to break in by climbing a ladder to the top of the roof. Because the ladder did not reach all the way to the top, they had to climb up in two stages, pulling the ladder up behind them and propping it on another part of the building to climb up higher. They then entered the school through a "lift-up" window on the second floor. The defendant went in first, followed by Lard and Copeland. They went downstairs to a janitorial room and then to the cafeteria where the defendant and Lard ate some food. As they exited the cafeteria, the defendant grabbed the stop light off the wall. Next, they found another janitorial room and took two or three "pretty good-sized" boxes and one or two smaller boxes of toilet paper. They then left the school the same way they had come in, dropping the boxes of toilet paper and the stop light off the lower section of the roof to the ground. After walking back to the defendant's house and getting Copeland's truck, the trio returned to the school to get the toilet paper and stop light they had left behind. They hid the toilet paper in "some kind of high grass area" close to the defendant's house before returning to the defendant's house. Copeland and Lard then went to Lard's house where they spent the night.

Using some of the stolen toilet paper, the defendant, Lard, and Copeland, along with Robert Michaels, "rolled" Ethan Regan's yard the next night and hid the rest under a porch at a house behind an Amoco station. Copeland acknowledged that they saw Officer Chris Franks at the Amoco station the night they rolled Regan's yard and that there was toilet paper in the bed of his truck when Franks saw them. During direct examination, Copeland testified that the last time he saw the stop light was the night of the burglary when the defendant had it in his hand at the school. However, during cross-examination, the defense asked him why he did not recall telling the police in his second statement that he had seen the stop light at the defendant's house and had seen the defendant put it in his bedroom. Copeland maintained that he did not recall seeing the stop light after that night at the school.

---

[1]Neill testified that each case contained forty-eight rolls of toilet paper.

[2]Neill testified that the stop light, by changing colors from green, orange, and then to red, was used in the cafeteria to quieten the children when they were too loud.

On cross-examination, Copeland acknowledged that he was untruthful when he told the police that he did not know anything about the burglary when he was questioned on October 2, 2000, at 9:40 a.m. However, when he was questioned again that day at 2:30 p.m., he told the truth because he knew they were "going to get caught one way or another." Copeland admitted that he had a prior conflict with the defendant over a girlfriend but denied that the conflict affected his testimony.

Nineteen-year-old Timothy Lard testified that he and Copeland arrived at the defendant's house between 10:00 and 10:30 p.m., and they all went walking for about twenty-five minutes. At the school, they used a ladder that was lying beside the building to climb on top of the first floor and then pulled the ladder up and used it to gain access to the second floor where they climbed in through a window. They first went to a utility room and then to the cafeteria where they ate some ice cream from the freezer. The defendant took the stop light from the cafeteria, and they took two large boxes and two or three smaller boxes of toilet paper from the utility room. They exited the school from the same window they had entered and threw the boxes of toilet paper off the roof to the ground. Once they reached the ground, they hid the toilet paper in the "shadow of the building" and walked to the defendant's house to get Copeland's truck. They returned to the school in the truck, loaded the toilet paper, and took it to a field by the defendant's house where they left it for "a little while" before hiding it under the porch of a house behind the Amoco station. Lard admitted they rolled someone's yard with some of the toilet paper, and he subsequently showed the police the house where the rest of the toilet paper was hidden. Lard did not know what had happened to the stop light but last saw it at the defendant's house.

On cross-examination, Lard was questioned as to whether a ladder or a gutter had been used to gain entry into the school because, in Lard's statement to the police, he had said, "We climbed on the walkway to the first floor roof and climbed up the gutter to the second floor." After being shown his statement, Lard said that a gutter "may have been part of the way of how we got up there, but I do remember a ladder." Lard admitted that he had had problems with the defendant in the past.

Officer Chris Franks of the Savannah Police Department testified that, on a Sunday[3] morning around 2:00 a.m. while off duty and not in uniform, he was visiting his wife at the Amoco station where she worked. There, he saw the defendant, Timothy Lard, and others standing "in a huddle" beside Stephen Copeland's red Nissan pickup truck and, because he was acquainted with them, he went over to speak to them. Franks saw a large box of toilet paper, which the defendant and Lard were trying to cover up with a shirt or quilt, in the bed of the pickup truck. Franks did not say anything to them about the toilet paper because he did not think it was significant at the time. After learning of the break-in at the school from Officer T.J. Barker, Franks told Barker what he had seen at the Amoco and gave a statement to Chief Donald Derr.

---

[3]Officer Franks's testimony is unclear as to when this occurred in relation to the burglary. On direct examination, he said that, when he saw the toilet paper in the back of the pickup truck, he "didn't know at the time when all this took place. It was two or three days later." On cross-examination, however, he said he had seen the box of toilet paper before September 23 because he gave his "report in September."

Chief Donald Derr of the Savannah Police Department testified that during his investigation of the burglary, he got the names of the defendant, Lard, and Copeland and interviewed each of them. He first talked to Copeland who initially said he did not know anything about the burglary. However, when he talked to Copeland again later the same day, Copeland gave a different statement which was consistent with the statement Lard had given. Lard showed Derr the vacant house where the toilet paper was hidden, and a large amount of toilet paper in small rolls was recovered and turned over to the school. Derr testified that the value of the toilet paper and the stop light was approximately $353. Derr said that he did not have any independent proof implicating the defendant in the burglary other than Copeland and Lard's testimony. Derr executed a search warrant at the home of the defendant on October 3, 2000, but did not find the stop light or the toilet paper.

Testifying as the first witness for the defense, eighteen-year-old Gary Hutton said that he had known the defendant for five or six years and had seen him at the Amoco station on September 24, 2000, between 1:15 and 1:30 a.m. The defendant was alone in his red Camaro and talked to Hutton and Vincent Price for about thirty or forty-five minutes. Lard and Copeland arrived in Copeland's truck at the Amoco between 1:30 and 2:00 a.m. and asked Hutton and Price if they wanted to "go roll yards because they had the toilet paper in the back of the truck." After Hutton and Price declined, Lard and Copeland left. Hutton and Price talked to the defendant "a few more minutes" before going home. Vincent Price testified that he, Hutton, and the defendant were at the Amoco station between 1:15 and 1:30 a.m. when Copeland and Lard drove up in a red Nissan and asked if they wanted to "go roll yards." Shortly thereafter, the defendant, Copeland, and Lard left separately but headed in the same direction, the defendant in his vehicle and Copeland and Lard in Copeland's vehicle.

Jenny Steakley, the defendant's mother, testified that the defendant had not been with Lard or Copeland on September 23, 2000, and he came home alone about 1:45 a.m. the following morning, took a shower, and went to bed. She denied seeing the defendant with a stop light or boxes of toilet paper. Ms. Steakley said she was at home when the police executed the search warrant, and the police did not find the stop light or the toilet paper at her house.

Sharon Holt testified that the defendant, who was a friend of her daughter's, came to her house on September 23, 2000, between 5:00 and 6:00 p.m. to help them assemble a computer desk. The defendant remained at her house until about 1:30 a.m. but had left for about an hour with her daughter between 8:00 and 9:00 p.m. Although she did not believe the defendant could have been involved in the burglary "between the hours he was at [her] house," she never contacted the police to inform them that the defendant had been there that night.

The twenty-one-year-old defendant testified that Lard and Copeland had not been at his house on September 23, 2000, and the first time he had seen them that day was at the Amoco station. Lard and Copeland had toilet paper in their truck and asked the defendant, Hutton, and Price if they wanted "to go roll yards." The defendant said he went to Ms. Holt's house around 5:00 p.m. and stayed until approximately 1:30 a.m. except for an hour when he and Ms. Holt's daughter "rode through town . . . [and] got a movie at Movie Gallery." He denied seeing Lard or Copeland during

the hour he was away from Ms. Holt's. When he arrived back at Ms. Holt's, he "finished putting some doors on the desk . . . and then [they] sat down and watched the movie." After the movie ended, he went to the Amoco station where he talked to Hutton and Price for about twenty minutes before Lard and Copeland arrived. He noticed toilet paper in the back of Copeland's truck. He left the Amoco station at about the same time as Lard and Copeland but drove "straight home" and did not go anywhere with Lard and Copeland. He arrived home "[p]robably around one forty-five" a.m. and did not leave the house again. The defendant denied breaking in the North Elementary School and said he did not know why Lard and Copeland had implicated him in the burglary, other than they had "never really got along real well, and I guess they figured if they pointed it at me, they'd get in less trouble or something."

On cross-examination, the defendant testified that he and Lard had problems for "over a year probably" and that he and Copeland had "got[ten] into it several months back." He said that he did not know Chris Franks and that Franks had seen him at the Amoco on "a different night," "the same night [they] went to jail . . . several weeks later." The defendant admitted that Franks had seen him covering a box of toilet paper that night in the back of Copeland's truck and admitted that he had "roll[ed] yards that night."

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his conviction for burglary, asserting that the "State's witnesses did not prove beyond a reasonable doubt that Appellant had the requisite Mens Rea for the offense of burglary." He further argues that there was "no demonstration that Defendant knowingly or intentionally entered North Elementary School with the intent to commit theft, other than the testimony of two individuals previously convicted of the charge, both of whom gave conflicting stories in their initial statements and at trial and both of whom admitted to a history of conflict with the Appellant." Additionally, he argues that the testimony of his alibi witnesses "placed him in locations which would have made it impossible for [him] to commit the burglary of the school."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge,

accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant's arguments that the testimony of codefendants Timothy Lard and Stephen Copeland could not be believed and that the police investigation of the burglary was not as complete as it should have been overlook the fact that, as explained by Bolin, it is the trial judge and jury, rather than this court, who "determine the weight and credibility to be given to the testimony of witnesses." 405 S.W.2d at 771. In this matter, the jury, by its verdict, made the determination, which was its prerogative, that the State's proof of the defendant's guilt was believable and that his alibi proof was not. Thus, we conclude that the testimony of codefendants Timothy Lard and Stephen Copeland, corroborated by the testimony of Officer Chris Franks, was sufficient evidence to support the verdict of the jury.

## II. Sentencing

The defendant argues that the trial court erred in denying full probation and ordering that he serve fifteen days in confinement.

While the record on appeal includes a copy of the defendant's presentence report, showing that he had several misdemeanor traffic convictions prior to his participating in the burglary of the school, the record does not contain a transcript of the sentencing hearing. It was the duty of the defendant to provide an adequate record for appellate review. See Tenn. R. App. P. 24(b). "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Generally, when the appellate record is inadequate, the appellate court is precluded from considering the issue, and the trial court's ruling is presumed correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Thus, since the record does not include a

transcript of the sentencing hearing, at which the trial court would have explained the basis for its determination that the defendant should serve fifteen days in jail before beginning his period of probation, we are unable to review the trial court's reasoning and are left with the presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). Accordingly, we presume that the trial court was correct in ordering that the defendant serve fifteen days in jail before beginning his period of probation. See State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997).

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE